# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3391

_____

United States of America,                     *
                                              *
                   Appellee,                  *
                                              *
         v.                                   *
                                              *
LaQuan Dwayne Carter, also known              *
as "Quan," also known as "Q-Ball,"            *
                                              *
                   Appellant.                 *


         _____

No. 06-1365                          Appeals from the United States
         _____                 District Court for the
                                     District of Minnesota.

United States of America,                     *
                                              *
                   Appellee,                  *
                                              *
         v.                                   *
                                              *
Michael Greenlaw, also known                  *
as "Mikey,"                                   *
                                              *
                   Appellant.                 *

                   _____

         Submitted: September 26, 2006
             Filed:  March 23, 2007
                   _____

Before MURPHY, HANSEN, and RILEY, Circuit Judges.
_____

RILEY, Circuit Judge.

The district court sentenced Michael Greenlaw (Greenlaw) to 442 months' imprisonment and LaQuan Carter (Carter) to 405 months' imprisonment following their convictions on drug and firearms charges, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and (B) and 846, and 18 U.S.C. §§ 924(c) and (o), 1959 and 1961 . In this consolidated appeal, Greenlaw appeals the district court's (1) denial of his motion to sever the trial, (2) denial of his request to represent himself, and (3) sentence of 442 months' imprisonment. Carter appeals the district court's (1) denial of his Batson challenge,[1] and (2) finding that sufficient evidence supported his conviction of conspiracy to distribute crack cocaine. For the reasons stated below, we vacate Greenlaw's sentence and remand to the district court for resentencing. In all other respects, we affirm the judgment of the district court.

## I.    BACKGROUND

Greenlaw and Carter belonged to a gang named the "Family Mob," which sold crack cocaine on the south side of Minneapolis. From 1996 until his arrest in 1999, Norman Toney (Toney) supplied the Family Mob with cocaine, which Family Mob members cooked into crack cocaine and sold on the streets.

Family Mob members used their collective efforts to sell an estimated two to three kilograms of crack cocaine per week. For example, one member would hold the crack, another would hold the money, another would carry a gun for security purposes, and another would serve as lookout. Family Mob members hid the crack cocaine near them while on the street rather than carry it on their person or carried the crack in their mouths to be swallowed if police approached. They also hid guns in

---

[1]Batson v. Kentucky, 476 U.S. 79 (1986).

others' houses and basements to avoid being caught in possession of the firearms. Family Mob members discussed the location of these guns so the guns were available to them when needed.

The Family Mob established and defended a territory in south Minneapolis to sell crack cocaine. When the presence of Family Mob members alone was not enough to keep competitors out of their territory, the members employed intimidation and violence to defeat competition. For example, James Hicks (Hicks), a Family Mob member, testified that, on May 10, 1997, Carter and other Family Mob members were on the south side of Minneapolis dealing drugs when a confrontation with non-members occurred. According to Hicks, when the non-members returned to the area, Carter responded by firing a gun at their car.

Another incident occurred in October 1998, when Robert Lewis (Lewis), a member of a rival gang, the "Bogus Boys," shot and killed Family Mob member Daryl Bellamy (Bellamy). Family Mob member Everett Jones (Jones) testified he and Greenlaw responded by dynamiting Lewis's home. Hicks explained the Family Mob had to respond to Bellamy's death because otherwise "[m]ore people would have been coming over where we at trying to cause us bodily harm. Trying to shoot us, take guys' money, our drug clientele."

After the arrests of several Family Mob members, police recovered numerous weapons, including a .9 millimeter handgun with laser sight, an AR-15 rifle, a .40 caliber handgun, a Davis .38 caliber handgun, a "ball and cap revolver," a .20 gauge sawed-off shotgun, a .44 magnum, a .45 semi-automatic handgun, a .9 millimeter semi-automatic handgun, a .38 caliber pistol, a .9 millimeter Luger, and a Tech .9 millimeter handgun. In addition, police recovered approximately 240 grams of crack cocaine and nearly two kilograms of cocaine.

Eight defendants were indicted on various drug and firearm charges. Six of the defendants pled guilty, but Carter and Greenlaw elected a jury trial. The counts against both Carter and Greenlaw included conspiracy to distribute in excess of fifty grams of crack cocaine and conspiracy to possess firearms during and in relation to a drug trafficking crime. Greenlaw's charges also included two counts of carrying a firearm during and in relation to a drug trafficking crime and one count of carrying a firearm during a crime of violence.[2]

Following a two-week joint trial, the jury returned verdicts of guilty against both Carter and Greenlaw on all counts except one. Greenlaw was acquitted on one of two counts of carrying a firearm during a drug trafficking crime.

## II. DISCUSSION
### A. Greenlaw's Motion to Sever

Greenlaw first argues the district court erred in denying his motion to sever the trials. Greenlaw moved for severance of the trials during a pretrial hearing. The district court denied his request. Greenlaw did not renew his motion at the close of the government's case or at the close of all the evidence. Because of this omission, we review the denial of the motion for plain error. United States v. Haskell, 468 F.3d

---

[2] Greenlaw was charged also with one count of conspiracy to commit a violent crime in aid of racketeering and two counts of a violent crime in aid of racketeering. Carter was charged also with one count of aiding and abetting distribution in excess of five grams of crack cocaine and one count of a violent crime in aid of racketeering.

-4-

1064, 1070 (8th Cir. 2006).[3] We will "reverse only if there was misjoinder which had a substantial and injurious effect or influence on the verdict." Id.

Greenlaw contends severance was necessary because the jury was unable to compartmentalize the evidence. Greenlaw claims he was unfairly prejudiced in a complex case of multiple separate criminal acts by evidence relevant only to Carter. Greenlaw specifically points to the testimony of Tasha Humphries (Humphries), who testified Carter shot her boyfriend. Because Humphries failed to state Greenlaw was not present during that incident, and because Greenlaw and Carter were sitting next to each other in the courtroom, Greenlaw contends the jury may have improperly considered Humphries's testimony against him.

However, Greenlaw was never charged with the shooting. Humphries's testimony applied only to Carter, did not implicate Greenlaw in any way, and did not prevent Greenlaw from presenting a defense. Id. Greenlaw fails to demonstrate the jury was unable to compartmentalize this evidence as it related to Greenlaw and Carter. To the contrary, the fact Greenlaw was acquitted on one of the charges against him, i.e., carrying a firearm during a drug trafficking crime, indicates the jury considered the evidence against each defendant separately. Here, the district court did not abuse its discretion or plainly err in denying Greenlaw's severance request.

---

[3] As the Haskell decision recognized, the standard of review applicable to the denial of a severance motion has been a subject of debate. Haskell, 468 F.3d at 1070 n.3. United States v. Mathison, 157 F.3d 541, 546 (8th Cir. 1998), as did Haskell, adopted a plain error standard of review. But, United States v. Flores, 362 F.3d 1030, 1039 n.4 (8th Cir. 2004), adopted an abuse of discretion standard "in light of the purposes for requiring the motion's renewal." (quotation omitted). Regardless, whether we review the district court's decision for plain error or for abuse of discretion, the outcome in this case remains the same.

**B.      Greenlaw's Request for Self-Representation**

Greenlaw also argues the district court erred in denying his request to represent himself at trial.  We do not agree.  Before the court can consider if a defendant may represent himself, the defendant is required to make a clear and unequivocal request for self-representation.  United States v. Light, 406 F.3d 995, 998-99 (8th Cir. 2005).

Here, the government claims Greenlaw never made a clear and unequivocal request for self-representation.  Greenlaw, however, contends the following exchange shows otherwise:

> **The Court:** Are [your motions] having to do with getting a new lawyer? Are you asking to represent yourself or what are you going to do?
> **Greenlaw:** No, I'm asking to be a co-counsel, to be appointed with a different attorney and also be a co-counsel.
> **The Court:** What do you mean by "a co-counsel?"
> **Greenlaw:** To be entitled to all evidence that's being used against me, for my records, so I can prepare myself for trial.

Based on this colloquy, as well as prior demands for new counsel, Greenlaw argues he made a clear and unequivocal request to represent himself.  However, the record and these arguments fail to show a *clear and unequivocal* request for self-representation.  Greenlaw never adequately invoked his right to self-representation. Id. at 999.

**C.      Greenlaw's Sentence**

Greenlaw further claims the district court erred in sentencing him to 442 months' imprisonment.  First, Greenlaw argues the district court erred by denying his motion for downward departure.  Greenlaw specifically contends his criminal history was overstated and should have been category II instead of category III.  However, Greenlaw does not assert the district court failed to recognize it had the authority to depart, and nothing in the record suggests the district court was unaware of its

-6-

authority to depart. See United States v. Andreano, 417 F.3d 967, 970 (8th Cir. 2005), cert. denied, 126 S. Ct. 1118 (2006) (holding "[t]he discretionary denial of a motion for downward departure is unreviewable unless the court failed to recognize its authority to depart."). Consequently, on this record, the district court's discretionary denial of a motion for downward departure is unreviewable.

Greenlaw next argues the district court erred in sentencing him to 442 months. Greenlaw contends the district court abused its discretion and he should have received only a 15-year sentence. We disagree. An abuse of discretion occurs if the district court failed to consider a relevant factor that should have received significant weight, gave significant weight to an improper or irrelevant factor, or considered only appropriate factors but committed a clear error of judgment in weighing those factors. United States v. Haack, 403 F.3d 997, 1004 (8th Cir.), cert. denied, 126 S. Ct. 276 (2005). Greenlaw does not indicate what factors the court failed to consider or should have considered to arrive at a 15-year sentence. Greenlaw makes only vague assertions regarding his "age and historical characteristics" which do not establish the district court abused its discretion.

Here, based on a total offense level of 38 and a criminal history category III, the district court calculated an advisory Guidelines range of 292 to 365 months' imprisonment. The district court gave Greenlaw credit for 62 months already served on state drug-related charges. Thereafter, the district court sentenced Greenlaw to a concurrent 262 months' imprisonment for Count 1 (conspiracy to distribute crack cocaine), Count 2 (conspiracy to possess firearms in relation to a drug trafficking crime), Count 5 (conspiracy to assault with a dangerous weapon), and Counts 6 and 8 (assault with a dangerous weapon).[4]

---

[4]The district court arrived at this number by sentencing Greenlaw to 262 months for Count 1, 240 months each for Counts 2, 6, and 8, and 36 months for Count 5, all to be served concurrently.

We note, however, when considering Counts 4 and 10, which involved possession of firearms under 18 U.S.C. § 924(c), the district court committed an error. The district court sentenced Greenlaw consecutively to 5 years' imprisonment for Count 4 and to 10 years' imprisonment for Count 10. However, 18 U.S.C. § 924(c)(1)(A)(I) and (C)(I) require a 5-year sentence on Count 4 to be served consecutively to the 262-month sentence, and a 25-year sentence on Count 10 to be served consecutively to the total sentence after factoring in Count 4.

Under 18 U.S.C. § 924(c)(1)(C), "[i]n the case of a second or subsequent conviction under this subsection, the person shall . . . be sentenced to a term of imprisonment of not less than 25 years." Greenlaw's conviction under Count 10 was his second conviction under the statute. Thus, under § 924(c)(1)(C), Greenlaw should have been sentenced consecutively to the mandatory minimum sentence of 25 years for Count 10.

The district court determined Count 10 was not a second or subsequent conviction under § 924(c)(1)(C) because Greenlaw was only "convicted" at the entry of judgment of conviction. However, the Supreme Court has declared "[i]n the context of § 924(c)(1), we think it unambiguous that 'conviction' refers to the finding of guilt by a judge or jury that necessarily precedes the entry of final judgment of conviction." Deal v. United States, 508 U.S. 129, 132 (1993). Contrary to the district court's reasoning, Greenlaw was convicted when the jury found him guilty of Count 10, not at the entry of final judgment of conviction. Greenlaw's total sentence should include the mandatory consecutive 25 years under § 924(c)(1)(C), in addition to the mandatory consecutive 5-year sentence for Count 4.

The government did object to this error at sentencing, but did not appeal the issue. Because this error seriously affects substantial rights and the fairness, integrity, and public reputation of judicial proceedings and because we think it is judicially efficient for us to address the error, we exercise our discretion under Fed. R. Crim. P.

52(b)[5] and find the district court plainly erred in excluding the statutory mandatory sentence under Count 10.  See United States v. Barnett, 410 F.3d 1048, 1050-51 (8th Cir. 2005) (finding the district court's failure to impose a consecutive sentence under 18 U.S.C. § 924(c) was "an error [that] affected the substantial rights of the government and people of the United States to have defendants sentenced in accordance with governing law. . . . The public reputation of criminal trials and of sentencing would certainly be undermined if we were to decline to correct a clear error of law that would result in [a defendant] serving a sentence of five years less than that required by law."); United States v. Campos, 362 F.3d 1013, 1014 n.1 (8th Cir. 2004) ("[W]e have previously held that an error which lengthened a defendant's sentence by 21 months was a miscarriage of justice and we think that the result should be the same

---

[5]See Silber v. United States, 370 U.S. 717, 718 (1962) ("'In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings.'" (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936))); United States v. Granados, 168 F.3d 343, 346 (8th Cir. 1999) (per curiam) ("The Supreme Court and this court have recognized in criminal cases that appellate courts can examine a critical issue affecting substantial rights sua sponte under Fed. R. Crim. P. 52(b)."); see also United States v. Baugham, 449 F.3d 167, 170 (D.C. Cir. 2006) ("[T]his court in any event has the power to notice a plain error sua sponte" (citing Silber, 370 U.S. at 718)); United States v. Moyer, 282 F.3d 1311, 1313, 1317-19 (10th Cir. 2002) (recognizing the court had the power to correct the imposition of an illegal sentence sua sponte).  As we have noted above, fairness concerns run both ways.  See United States v. Cotton, 535 U.S. 625, 634 (2002) ("The real threat then to the 'fairness, integrity, and public reputation of judicial proceedings' would be if respondents, despite the overwhelming and uncontroverted evidence that they were involved in a vast drug conspiracy, were to receive a sentence prescribed for those committing less substantial drug offenses because of an error that was never objected to at trial.").  But see United States v. Rivera, 411 F.3d 864, 867 (7th Cir.) (refusing to correct sentence that was below the statutory mandatory minimum because "[b]y deciding not to take a cross-appeal, the United States has ensured that [the defendant's] sentence cannot be increased"), cert. denied, 126 S. Ct. 493 (2005).

when an error shortens a defendant's sentence by an equal or greater amount. . . . It goes without saying that both the defendant and the people of the United States are entitled to equal justice." (internal citation omitted)). This error shortened Greenlaw's sentence by a statutorily mandated additional 180 months, which sentence is contrary to law and a miscarriage of justice.[6]

### D.    Carter's <u>Batson</u> Motion

Carter contends the district court erred in overruling his <u>Batson</u> challenge of the government's peremptory strike of the sole minority member[7] of the jury pool. <u>Batson</u>

---

[6]We also note the district court erred in concluding that, without a jury finding (citing <u>United States v. Booker</u>, 543 U.S. 220 (2005)), it could not make a finding with respect to whether Greenlaw possessed a firearm in connection with Count 1. The district court said: "I just don't think under <u>Booker</u> I can make that determination." Contrary to the district court's assertion, the district court can make that determination under <u>Booker</u> when calculating an advisory Guideline range. <u>See</u> <u>United States v. Sandoval-Rodriguez</u>, 452 F.3d 984, 990-91 (8th Cir. 2006). The government objected to this <u>Booker</u> error, but did not appeal the error. Under plain error review, an error must be plain, affect substantial rights, and seriously affect the fairness, integrity, or public reputation of judicial proceedings. <u>Johnson v. United States</u>, 520 U.S. 461, 466-67 (1997); <u>United States v. Pirani</u>, 406 F.3d 543, 550 (8th Cir.) (en banc), <u>cert. denied</u>, 126 S.Ct. 266 (2005). The § 924(c)(1)(C) error we recognize today as plain is triggered primarily because the error violates a Congressional mandate. This <u>Booker</u> error does not. Based on the unique circumstances of this sentencing, we conclude this <u>Booker</u> error does not affect substantial rights or seriously affect the fairness, integrity or public reputation of the judicial proceedings. The district court treated the Sentencing Guidelines as advisory and, in a separate exercise of our plain error review discretion, we determine "the effect of the error on the result in the district court is uncertain or indeterminate— where we would have to speculate" as to how the error affected the substantial rights of the parties. <u>See</u> <u>Pirani</u>, 406 F.3d at 553 (quoting <u>United States v. Rodriguez</u>, 398 F.3d 1291, 1301 (11th Cir.), <u>cert. denied</u>, 545 U.S. 1127 (2005)). Therefore, exercising our Rule 52(b) power "sparingly," we do not find the district court's <u>Booker</u> error was plain error. <u>See</u> <u>Jones v. United States</u>, 527 U.S. 373, 389 (1999).

[7]This veniremember had a Hispanic surname. Carter is black and not Hispanic.

-10-

challenges are evaluated under a three-part analysis.  United States v. Blaylock, 421 F.3d 758, 769 (8th Cir. 2005), cert. denied, 126 S. Ct. 1108 (2006).  First, a defendant must make a prima facie showing that the prosecutor has stricken a potential juror because of race.  Second, if such a showing is made, the burden shifts to the prosecutor to articulate a race neutral explanation for striking the prospective juror.  Third, the district court must decide the ultimate question of whether or not the defendant has proven purposeful discrimination.[8]  Id.  The district court's ultimate finding on the issue is set aside only if clearly erroneous.  Id.  "If there is no inherently discriminatory intent in the prosecutor's explanation, the reason offered will be deemed race neutral."  United States v. Roebke, 333 F.3d 911, 913 (8th Cir. 2003) (quotation marks and citation omitted).

Here, we focus on the second step of the analysis because the government, by offering a race neutral explanation, in effect, excused Carter from establishing a prima facie case of racial discrimination.  See id.  Thus, the court must determine whether the government articulated a race neutral explanation for striking the minority veniremember.

The government first claims this veniremember was stricken from the panel because of his employment with the postal service and argues many postal employees are unhappy with the government.  On appeal, Carter attempts to show this reason was merely a pretext by pointing to a similarly situated juror who was employed by the government as an air traffic controller but was not stricken from the panel.  However, because Carter never made this "similarly situated" argument before the district court, he cannot raise it for the first time on appeal.  United States v. Gibson, 105 F.3d

---

[8]At the third stage, the question may be framed in terms of pretext.  However, "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."  See United States v. Meza-Gonzalez, 394 F.3d 587, 593 (8th Cir. 2005) (quoting Purkett v. Elem, 514 U.S. 765, 767-68 (1995)).

-11-

1229,1232 (8th Cir. 1997) (holding a "similarly situated" juror argument must be made at the trial level and is untimely if it is raised for the first time on appeal).

Nevertheless, the veniremember's employment is not the sole reason the government struck this person from the panel. The government also chose to strike this veniremember because his nearly empty questionnaire showed a lack of interest in the process. Lack of interest in the process is a valid, race neutral reason to strike a juror. See United States v. Jenkins, 52 F.3d 743, 747 (8th Cir. 1995). Based on the veniremember's short and vague answers to his questionnaire, the district court determined no discriminatory intent was inherent in the government's explanation to strike this veniremember. We give deference to the district court on its finding that the government's reasons for striking the veniremember were race neutral and not pretextual. See United States v. Pherigo, 327 F.3d 690, 696 (8th Cir. 2003).

Carter contends the district court rushed its ruling without affording him the third step of the relevant inquiry, i.e., to show the government's explanation was pretextual. However, nothing in the record indicates the district court failed to assess whether the reason offered by the government to strike this veniremember was a valid race neutral reason. As a result, the district court's finding that the government had a valid race neutral reason to strike the veniremember is not clearly erroneous.

### E.    Carter's Sufficiency of the Evidence Challenge

Carter argues insufficient evidence exists to support his conviction for conspiracy to distribute crack cocaine. To convict Carter of a conspiracy to distribute crack cocaine, the government had to prove there was an agreement to distribute crack cocaine–an agreement known to Carter in which he intentionally joined. United States v. Cook, 356 F.3d 913, 917 (8th Cir. 2004). The government can prove a conspiracy by direct or circumstantial evidence. Id. We review de novo the sufficiency of the evidence to sustain a conviction and will uphold a jury verdict if substantial evidence supports it. Light, 406 F.3d at 997. We view the evidence in the light most favorable

to the verdict and accept as established all reasonable inferences supporting the verdict.  Id.

First, Carter points to the testimony of Toney, the Family Mob's primary supplier of cocaine.  Toney testified he sold drugs to Carter individually on three or four occasions.  Carter claims Toney's testimony eliminates him as part of a conspiracy because it demonstrates a very limited participation by Carter.  This argument, however, is without merit.  "Participation by a defendant in a single act may in fact demonstrate membership in a conspiracy if the act itself will justify an inference of knowledge of the broader conspiracy."  United States v. Tran, 16 F.3d 897, 904 (8th Cir. 1994).  Testimony indicated Carter actively participated in the drug activities of the Family Mob, agreed to stake out the gang's territories where it sold crack cocaine, and embraced the use of firearms to protect the group's trafficking turf.  This evidence supports the reasonable inferences that the drug purchases from Toney were a part of the Family Mob's drug trafficking activities, Carter knew there was an agreement among the Family Mob's members to sell drugs, and Carter participated knowingly in that agreed activity.

Carter argues his conviction for aiding and abetting the sale of drugs to Ernest Moss, an individual not connected with the Family Mob, indicates he was working alone and not as part of a conspiracy.  However, that Carter made deals on his own or associated with individuals other than Family Mob members does not exculpate him from being a co-conspirator with Family Mob members.

Carter also argues certain testimony indicated Toney, Jones, and other Family Mob members believed Carter to be a snitch.  According to Carter, this testimony indicates he was not part of the conspiracy.  However, the jury chose not to credit this testimony, and we leave credibility questions to the jury.  United States v. Hill, 249 F.3d 707, 714 (8th Cir. 2001).

-13-

Finally, Carter contends the acts of violence described by the government as acts in furtherance of drug trafficking were only acts of violence as a result of personal disputes. He contends most of the acts of violence resulted from the death of Bellamy, the Family Mob member who was killed by a member of the rival gang the Bogus Boys. However, that the Family Mob retaliated does not indicate the Family Mob members were solely avenging Bellamy's death. As Family Mob member Hicks testified, Bellamy's death required a response because "[m]ore people would have been coming over . . . [t]rying to shoot us, take guys' money, our drug clientele." Such testimony indicates retaliation, protection, money, and preservation of the drug customer base were all factors intertwined and linked to the Family Mob's criminal behavior.

We conclude the record as a whole is sufficient to support the jury's finding Carter conspired with the Family Mob to distribute crack cocaine. Accordingly, we affirm Carter's conviction.

## III. CONCLUSION

For the foregoing reasons, we vacate Greenlaw's sentence of 442 months' imprisonment and remand Greenlaw's sentence to the district court to impose the statutory mandatory consecutive minimum sentence of 25 years under Count 10, and we affirm the district court's judgment in all other respects.

————————————

-14-